UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | C.A. No. 21-cv-8598 |
| ROBERT BERNARDI, NIHAT CARDAK, and SUNIL CHANDRA, | |
| Defendants, | Jury Trial Demanded |
| and | |
| DANIEL BERNARDI, DIANE OLSON, and JENIFER BERNARDI, | |
| Relief Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Robert Bernardi ("Bernardi"), Nihat Cardak ("Cardak"), and Sunil Chandra ("Chandra"), and Relief Defendants Daniel Bernardi, Diane Olson, and Jenifer Bernardi, alleges as follows:

## SUMMARY

1.     From at least March 2018 through August 2019, Bernardi and Cardak defrauded investors in GigaMedia Access Corporation ("Giga"), a privately held encryption software company. Bernardi, Giga's founder and CEO, and Cardak, Giga's CFO, raised over $37 million in debt and equity from sophisticated investors through a fraudulent scheme in which they

fabricated bank statements, falsified purported audited financial statements, and enlisted an employee, Chandra, to impersonate a customer on an investor due diligence call.

2.      Bernardi and Cardak's fraudulent practices violated the anti-fraud provisions of the federal securities laws. Chandra aided and abetted Bernardi and Cardak's violations.

## VENUE AND JURISDICTION

3.      This Court has subject matter jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§ 77t(b) and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

4.      In connection with the conduct alleged in this Complaint, Defendants have, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

5.      Venue is proper in this District pursuant to Securities Act Section 22 [15 U.S.C. § 77v] and Exchange Act Section 27 [15 U.S.C. § 78aa].   Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District. Specifically, Defendants offered securities of Giga stock by sending emails to potential investors located within this District and attending an in-person meeting with potential investors within this District. Additionally, in one of the contracts by which Giga effected its fraud, described below in paragraph 56, Defendants chose this District as the exclusive venue in which the parties could resolve disputes arising out of their agreement.

## DEFENDANTS

6.      **Robert Bernardi** ("Bernardi") founded Giga in 2000 and served as its CEO and President until October 2019. He resides in McLean, Virginia.

7.     **Nihat Cardak** ("Cardak") was the CFO of Giga from 2006 until October 2019. He resides in Clifton, Virginia.

8.     **Sunil Chandra** ("Chandra") was a Giga employee from 2006 until October 2019. At all relevant times, his title was Vice President of International Business Development. He resides in Marshall, Virginia.

## RELIEF DEFENDANTS

9.     Daniel Bernardi is Robert Bernardi's son and received investor proceeds in connection with the fraudulent transaction described below in Facts Section A.

10.     Diane Olson is Robert Bernardi's daughter and received investor proceeds in connection with the fraudulent transaction described below in Facts Section A.

11.     Jenifer Bernardi is Robert Bernardi's daughter and received investor proceeds in connection with the fraudulent transaction described below in Facts Section A.

## OTHER RELEVANT ENTITY

12.     **GigaMedia Access Corp** ("Giga"), d/b/a GigaTrust, GigaMedia Holdings Corporation, and GigaMedia Merger Sub Corporation**,** is a now-defunct privately held software company, incorporated in Delaware in 2000 and located in Herndon, Virginia.  Bernardi and Cardak operated Giga at all relevant times until their ouster in October 2019. In October 2019, Giga breached its loan agreement with one of its defrauded investors, and that investor exercised its rights under the loan agreement to take control of the company. The investor named an independent third-party forensic accounting firm to restructure Giga, and Giga filed for bankruptcy on November 27, 2019. Giga is not registered with the Commission.

## FACTS

13.     Bernardi founded Giga in 2000 as a private encryption software company.  Giga marketed itself as a leading provider of content security services to hundreds of large enterprises. Touting Giga's growing business and healthy financial condition, Bernardi and Cardak engaged in a series of offering frauds in which they falsely told potential investors and lenders that Giga had annual revenues over $50 million and a promising new product, Gigacloud, that already had several hundred customers.  In reality, Giga had annual revenues of less than $2 million in the relevant years and fewer than 50 customers.

### A.  Fraud in Connection with a 2018 Investment in Giga

14.     In March 2018, Bernardi was introduced to a private fund focused on secondary offerings of technology companies ("Purchaser 1") as a potential equity investor. Over the next several months, Purchaser 1 performed an in-depth due diligence on Giga, including developing financial models and researching Giga's products.

15.     During this period, Bernardi and Cardak materially misrepresented to Purchaser 1: (a) the number of Gigacloud customers, (b) Giga's prior year revenue as over $50 million, and (c) its balance sheet as having more than $20 million in available cash.

16.     On or about March 16, 2018, Cardak sent Bernardi an email titled, "Draft income statement and balance sheet." In the body of the email, Cardak wrote, "Attached:  Let me know of any changes." The attached draft balance sheet showed Giga having $12,575,426.97 in cash as of December 31, 2017. In fact, Giga only had about $70,000 in cash on that date.

17.     On or about March 27, 2018, Bernardi sent an email with multiple attachments to Purchaser 1. One attachment purported to be a partial list of Giga's clients. There were over 150 customers on that list. Another attachment was a December 2016 "Management Presentation" slide

presentation. In that presentation, Giga purported to have 400 "active customers" in the Fortune 2000. These claims were false. Giga had fewer than 50 customers at this time.

18.     On or about March 28, 2018, Bernardi sent an email to Purchaser 1 with multiple attachments. One attachment was a modified version of the draft balance sheet for Giga that Cardak had previously sent to Bernardi. This attachment showed Giga having $16,575,426.97 in cash as of December 31, 2017. In other words, Bernardi and Cardak had changed a "2" to a "6" to make Giga look $4 million richer to Purchaser 1. Both numbers were complete fabrications in any event, as Giga actually had only $70,000 in cash at the close of 2017.

19.     On or about May 4, 2018, Cardak emailed Purchaser 1, copying Bernardi with the subject line, "GT 2017 Financials." In the body of the email, Cardak claimed to have attached the "correct sheet for the revenue breakout." The attached file purported to show Giga's income on a quarterly basis from the second quarter of 2016 through the first quarter of 2018. The total revenues for 2017 shown on this chart exceed $55 million. These figures were false – Giga's revenues for 2017 totaled only about $1.5 million.

20.     On or about June 25, 2018, Cardak emailed Bernardi a document purporting to be audited financial statements and an independent audit report for Giga for 2017, prepared by Giga's independent auditor. In fact, the document was a fake. In the body of the email, Cardak wrote, "Attached is the final version for the 2017 audit for [Purchase 1]. Please review and let me know of any changes." The audit report claimed to present Giga's audited financial statements for the year December 31, 2017. The included balance sheet showed Giga having just over $20 million in cash as of December 31, 2017 and total revenues for 2017 of about $57 million. As explained above, those numbers were wildly inflated.

21.     On or about June 26, 2018, Bernardi emailed Purchaser 1, attaching "Additional Due Diligence Items," specifically the fake audit report for 2017 and draft financials for Giga ending May 31, 2018. The draft balance sheet for May 31, 2018 showed Giga having about $24.5 million in cash as of that date, and the draft income statement showed total year-to-date revenue of more than $25 million. As with the 2017 audit report, the 2018 draft financial statements were fabricated documents containing false information about Giga's revenues and cash position.

22.     In August 2018 and November 2018, Purchaser 1 coordinated investments in Giga totaling $8.3 million. The majority of those investments involved the purchase of shares of Giga stock from Bernardi or his family members and were effected through Securities Purchase Agreements. Bernardi personally received $4 million in exchange for the shares of Giga stock he sold pursuant to his Securities Purchase Agreement. Bernardi's children, Daniel Bernardi, Diane Olson, and Jenifer Bernardi, personally received $400,000, $300,000, and $300,000, respectively in exchange for the shares of Giga stock they sold pursuant to their respective Securities Purchase Agreement. The Securities Purchase Agreements were all secured through Bernardi and Cardak's fraud, and the shares transferred were sold at an inflated value. On information and belief, Daniel Bernardi, Diane Olson, and Jenifer Bernardi were given the shares they transferred pursuant to the Securities Purchase Agreements. Daniel Bernardi, Diane Olson, and Jenifer Bernardi did not exchange anything of equivalent value for the investor funds they received.

23.     Bernardi and Cardak's deceit regarding Giga's customer base, revenues, and balance sheet was material to Purchaser 1's investment decision. Giga's cash on the balance sheet was important to Purchaser 1 because it meant that the company was not at risk of a liquidation event that could imperil the private fund's equity investment. The revenue figures were material because they directly affected the value of Purchaser 1's investment.  And the customer lists were

material because they gave Purchaser 1 comfort that Giga had built a strong client base that was therefore more likely to continue generating revenue in the future.

**B.  Fraud in Connection with a 2018 Offer of Securities**

24.     In early July 2018, Bernardi was introduced by email to a representative of a New York investment firm ("Offeree 1"). On July 5, 2018, Bernardi emailed Offeree 1 and wrote that he would like to discuss "your interest to refinance our outstanding debt and to consider an additional equity investment."

25.     On July 24, 2018, Offeree 1 emailed Bernardi to request Giga's most recent audit and "financials for the last few years."

26.     On July 27, 2018, Bernardi emailed Cardak. At the bottom of the email was Offeree 1's request for documents. Bernardi wrote to Cardak, "We need to revise 2016, 2017 audits and Q1/Q2 2018 for [Offeree 1]. We can do a redo with all docs coordinated. Attached are some suggestions for cash, deferred revenue, revenue breakdown, BP loan and cap table."

27.     Attached to Bernardi's email were documents purporting to be financial statements for Giga, including a balance sheet as of December 31, 2016 and 2017, a statement of operations for 2016 and 2017, and a draft balance sheet as of June 30, 2018. On these documents, Bernardi had circled certain figures and written in his suggested changes. For example, the balance sheet for December 31, 2016 and 2017 stated that Giga had about $20 million in cash on December 31, 2017. Bernardi circled and scratched out that figure and wrote near it, "increase cash $25M." He wrote at the bottom of that document, "We can adjust cap table if it helps." Bernardi also circled the amount shown for cash as of June 30, 2018—about $32.7 million—and put a question mark next to it.

28.     On August 6, 2018, Bernardi emailed to Offeree 1 Giga's "2017 audit and June 30, 2018 financials." The attached audit report is similar to the one Bernardi sent to Purchaser 1, except that certain key numbers had been additionally inflated. For example, the balance sheet for December 31, 2017, which had previously shown Giga having about $20 million on that date, now showed $28 million for that day. Revenues had also increased from $57 million to $58 million.

29.     The draft balance sheet as of June 30, 2018 had also changed from the one Bernardi commented on in July 2018. It now stated that Giga $29.2 million in cash.

30.     The documents Bernardi emailed to Offeree 1 were fabrications that did not accurately represent Giga's financial performance.  Giga's revenues for 2017 and first six months of 2018 were all grossly overstated. Giga never earned more than about $2 million per year, but these documents represented that Giga had total revenues of over $40 million in 2017 and more than $32 million in revenue in the first half of 2018.

31.     The documents also misrepresented Giga's cash position as of December 31, 2016 and 2017 and as of June 30, 2018. Giga never had more than $2 million in cash on these dates, but the documents represented that it had more than $20 million on each of these dates.

32.     At the end of August 2018, Offeree 1 told Bernardi that it would like to begin a more thorough due diligence process. In the course of the parties' discussions, Bernardi traveled to New York on or about September 19, 2018, and met with representatives of Offeree 1 at its offices to discuss a possible investment by the firm.

33.     On November 27, 2018, Bernardi emailed Offeree 1 additional due diligence materials, including an income statement for the first three quarters of 2018 and a balance sheet as of September 30, 2018. The income statement showed total revenues in excess of $48 million, and the balance sheet showed Giga had more than $35 million in cash. Both of these figures were

materially false, as Giga's revenues for the first three quarters of 2018 were less than $2 million, and it had less than $1 million in cash on September 30, 2018.

34.     Ultimately, Offeree 1 chose not to invest in Giga.

**C.  Fraud in Connection with a 2019 Offer and Sale of Securities in Exchange for a Loan**

35.     In May 2019, Bernardi negotiated a $4 million loan for Giga from a different private fund ("Purchaser 2"), one that had been a Giga investor since 2010. As part of the consideration for the loan, Bernardi transferred 2.6 million shares of his own preferred stock to Purchaser 2 and caused Giga to issue a warrant allowing Purchaser 2 to purchase 2.5 million additional shares of preferred stock from the company at a fixed price. This transaction was a purchase and sale of securities for purposes of the federal securities laws.

36.     To secure the loan, Bernardi and Cardak fabricated financial documents and sent them to Purchaser 2 to overstate Giga's recent revenues and its balance sheet. On May 10, 2019, Cardak sent Bernardi an email with the subject line, "Information for [a Purchaser 2 representative]." Attached to that email were fake financial documents for Giga, including balance sheets, income statements, cash flow statements, and a Bank of America account statement. The income statement for 2018 showed total revenue of $53 million. A balance sheet dated March 31, 2019 showed Giga having $23 million in cash. The Bank of America account statement showed over $15 million in that single account.

37.     All of these documents were fabricated. Giga's 2018 revenues were approximately $1 million, not $53 million. As of March 31, 2019, Giga had less than $1 million in cash, and the relevant Bank of America bank account had only $100 as of April 30, 2019. The account statement Cardak sent Bernardi also contained an error on its face, as it purported to be a statement for April 2019, but the starting and ending balances were dated November 1, 2018 and November 30, 2018.

38.     Later that day, Cardak emailed a new round of fake documents to Bernardi. While the income statement for 2018 still showed total revenue of $53 million, the balance sheet dated March 31, 2019 now showed Giga having $28 million in cash, and the Bank of America account statement showed over $18 million in the account as of April 30, 2019. Tellingly, Bernardi and Cardak forgot to edit the "average ledger balance" on the revised fake statement, so while the starting and ending balance are over $18 million and the statement reflects minimal activity during the month, the average ledger balance is approximately $15 million, the same as it was on the previous iteration of the fake statement. They also failed to correct the error previously described.

39.     That same day, May 10, 2019, Bernardi emailed the set of documents with the even higher numbers to Purchaser 2. In the body of the email, Bernardi wrote, in part, "Attached is GigaTrust financial information."

40.     On or about May 11, 2019, Bernardi emailed Purchaser 2 the consideration for its $4 million loan to Giga, specifically: a promissory note for $4 million, executed by Bernardi on behalf of Giga; a warrant entitling Purchaser 2 to purchase 2.5 million shares of preferred Giga stock, executed by Bernardi on behalf of Giga; and confirmation that Bernardi had instructed Cardak to transfer an additional 2.6 million shares of Bernardi's preferred Giga stock to Purchaser 2. On or about May 13, 2019, Purchaser 2 wired $4 million to Giga in exchange for this consideration.

41.     The false information Bernardi provided to Purchaser 2 about Giga's finances was material to Purchaser 2's decision to participate in this transaction. The false information about Giga's cash on hand was important because it gave Purchaser 2 comfort that Giga could repay the loan. Information about Giga's revenues was important to Purchaser 2's assessment of the value of the warrants and preferred stock it received as consideration for the loan.

**D.      Fraud in Connection with Giga's July 2019 Debt Offering and Sale**

42.      In the summer of 2019, Giga negotiated to move its outstanding debt to a new lender ("Purchaser 3"). As part of the transaction, the lender demanded Giga's corporate reorganization and a pledge of stock as collateral so that, in the event of a covenant breach, the lender could take control of the company. This stock pledge was a key element of the transaction from Purchaser 3's perspective and constituted the purchase and sale of securities for purposes of the federal securities laws.

43.      During the due diligence process, Bernardi and Cardak systematically deceived Purchaser 3 regarding Giga's financial condition. On or about July 3, 2019, Bernardi provided fabricated audit reports for Giga for the years 2015-2018. The audit reports presented fake revenues for each of these years. Specifically, the reports showed that Giga had total revenues in excess of $45 million in 2017 and in excess of $53 million for 2018. Each of these figures was a fabrication. Giga's revenues did not exceed $2 million in either of these years.

44.      Also in July 2019, Purchaser 3 requested to speak with Giga customers and with a representative of Giga's accounting firm. Instead, Bernardi arranged for Purchaser 3 to speak with Defendant Chandra, who pretended to be an employee of a Giga customer. Bernardi also arranged for Purchaser 3 to speak with another individual who posed as a partner at Giga's third-party accounting firm.

45.      Before the customer calls, on or about July 18, 2019, Bernardi sent Cardak an email with the subject line, "Voice converter." In the body of the email, Bernardi wrote, "Can you find a good quality voice converter on Amazon and send me the links so I can buy it for the customer calls[?] Or besides Neal [Chandra], who can we get to talk to [Purchaser 3] next week for 2 additional customer calls[?]"

11

46.     Also on July 18, 2019, Bernardi sent Chandra an email with the subject line, "customer questions." Attached was a file that Bernardi described as "questions that you will be asked by [Purchaser 3]." On the morning of the call, Bernardi sent the questions again, and Chandra replied, "I am well prepared for it."

47.     On or about July 19, 2019, Bernardi sent Cardak an email. In the body of the email, he wrote, "Look at the attached voice changers. Would these or any others work for customer calls[?] Need your help here."

48.     Chandra's call with Purchaser 3 occurred on or about July 22, 2019. Bernardi introduced Chandra as the director of security of a large, well-known, multinational computer hardware and information technology company. Chandra maintained the ruse, lying to Purchaser 3 about his identity and about the purported customer's use of Giga's products. Chandra claimed that his company had been using Giga's products for over two years. He was highly complementary of Giga's products and claimed that his company planned to continue using Giga well into the future.

49.     Chandra's misrepresentations were important to Purchaser 3 because they gave it comfort that Giga had a strong, loyal customer base. The following month, Bernardi rewarded Chandra for his cooperation by giving him a $50,000 bonus.

50.     The day after the call, Bernardi emailed Purchaser 3 and referred to the prior day's call with Chandra, referring by name to the actual director of security of the purported customer.

51.     On July 30, 2019, Bernardi sent Cardak an email explaining that Purchaser 3's final requirements before closing on the transaction were (1) a bank statement for an account at Bank of America demonstrating that Giga had $25 million in the bank on that date to satisfy a minimum liquidity requirement, and (2) bank statements for January through June 2019.

52.     That same day, Bernardi and Cardak conferred regarding how to fabricate bank statements that would satisfy Purchaser 3. Bernardi emailed Cardak purported Giga bank statements for a Bank of America account for the months of February, March, and April 2019. Bernardi explained that Giga had previously sent these documents to a different third party and asked, "Does this help either with numbers or BOA style[?]" Cardak responded, "The style stays the same[;] the amount have changed [sic] on what I sent you because it need [sic] to correspond with what [the investment bank working on the transaction] has already." In other words, Cardak could use the documents to recreate the look of a Bank of America bank statement, but he would need to change the amounts they reflected so the investment bank in the current transaction would not realize they were fake.

53.     The next morning, on July 31, 2019, Cardak emailed Bernardi a set of fake bank statements for Bernardi's review before they sent them to Purchaser 3. Cardak wrote in the body of the email that he "did make sure that the balance did sink [sic] up with what we gave them and what was discussed in the past."

54.     Later that morning, Cardak sent Bernardi a new email to which he attached what he described as "six months of bank statements for [Purchaser 3]." The attached documents were fabrications.

55.     Bernardi forwarded the email and its attachments to Purchaser 3. The fake statements purported to show that as of July 30, 2019, Giga had more than $38 million in its Bank of America account and that Giga had more than $30 million in its accounts for each month between January and June 2019. In fact, Giga had less than $1 million in the bank as of July 30, 2019 or at any time that year.

56.    On July 31, 2019, Bernardi executed a Guaranty and Security Agreement on behalf of Giga. In that agreement, Giga agreed, among other things, to pledge 100,000,000 shares of Giga preferred stock in exchange for a $25 million term loan from Purchaser 3. The parties agreed that any proceeding with respect to the Guaranty and Security Agreement would be brought in the "courts of the State of New York Located in the City of New York, Borough of Manhattan, or the United States District Court for the Southern District of New York."

57.    The false information Bernardi provided to Purchaser 3 about Giga's finances was material to Purchaser 3's decision to participate in this transaction. The false information about Giga's cash on hand was important because it gave Purchaser 3 comfort that Giga could repay the loan. Information about Giga's revenues was important to Purchaser 3's assessment of the value of the stock pledge it received as consideration for the loan.

### E.    Fraud in Connection with Giga's Attempted 2019 Equity Offering

58.    In 2019, Bernardi and Cardak sought additional equity investors in Giga. In the summer of 2019, a private equity firm ("Offeree 2") began to perform an in-depth diligence on Giga and began requesting detailed information from Giga and Giga's investment bank.

59.    On August 8, 2019, the investment bank emailed Bernardi and Cardak requesting Giga's ending cash and debt balance as of July 31, 2019, so that the information could be provided to Offeree 2 in a term sheet.  That same day, Cardak emailed Bernardi an amount for Giga's ending cash balance in two accounts, and Bernardi forwarded the information on to the investment bank.

60.    Bernardi and Cardak's email falsely showed a $38 million ending balance for Giga's "Investment Account" and an almost $1 million ending balance for Giga's "Operating Account."  In reality, the "investment" account only had $100.00 and the "operating" account had

$5 million. Despite undervaluing the operating account, Cardak and Bernardi's emails overstated Giga's cash position by $33 million.

61.     As the investment bank had told them, Cardak and Bernardi's fabricated cash balance ended was used on the term sheet presented to Offeree 2 as part of Giga's offer of securities.  Giga's cash balance was material to the offer because it suggested that Giga had a stronger financial position than it actually did. Offeree 2 withdrew from negotiations after some external checks it conducted during its due diligence came back negative.

62.     In September 2019, Giga offered a potential $30-50 million equity private placement to a different private equity firm ("Offeree 3"). On September 13, 2019, Bernardi emailed Offeree 3, copying Cardak, a draft balance sheet for the period ending July 31, 2019 showing a cash amount of $43 million. Giga's cash balance was material to Giga's offer because it suggested that Giga had a stronger financial position than it actually did. As described above, Giga had only about $5 million in cash on that date.  Offeree 3 did not complete the transaction.

### F.     Defendants Acted Knowingly, Recklessly or Negligently at All Relevant Times

63.     Bernardi and Cardak acted knowingly, recklessly or negligently in their deception of Purchaser 1, Purchaser 2, Purchaser 3, Offeree 1, Offeree 2, and Offeree 3. As the CEO and CFO of Giga, they knew or were reckless in not knowing that the documents they provided to these firms misrepresented Giga's customer base, its revenues, and its cash position. Working together, they fabricated Giga's purported customer lists to make it appear had a broader customer base than it actually did. Bernardi instructed Cardak in how to doctor Giga's purported independent audit reports and bank statements to overstate Giga's financial performance and to satisfy specific purchaser requirements.

64.     The discrepancies between the false information Cardak and Bernardi sent to various purchases or offerees only underscores that they acted knowingly, recklessly or negligently. For example, they told Offeree 2 that Giga had $38 million in cash on July 31, 2019 but later told Offeree 3 that Giga had $43 million in cash on that exact same date. Similarly, they provided fake documents to Purchaser 1 showing Giga had total revenues in excess of $55 million in 2017, whereas the fake documents they provided to Offeree 1 showed $40 million in revenues that year, and the documents they provided to Purchaser 3 showed total revenues of about $45 million that year.

65.     Chandra also acted knowingly or recklessly. He pretended to be a Giga customer on a call with Purchaser 3, lying about his true identity to assist Bernardi and Cardak's deception.

## CLAIMS

### FIRST CLAIM FOR RELIEF

(Against Bernardi and Cardak for Violations of Section 17(a) of
the Securities Act)

66.     Paragraphs 1 through 65 are realleged and incorporated by reference as if fully set forth herein.

67.     By reason of the conduct described above, Bernardi and Cardak, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

68.     As alleged above, Bernardi's fraudulent violations included: emailing falsified documents to Purchasers 1, 2, and 3 and Offerees 1 and 3; coordinating with Cardak concerning the specific false information to include in those documents; and forwarding an email from Cardak to Offeree 2 containing false information about Giga's cash balance. As alleged above, Cardak's fraudulent violations included: providing falsified documents for Bernardi to email to Purchasers 1, 2, and 3 and Offerees 1 and 3; coordinating with Bernardi concerning the specific false information to include in those documents; emailing a falsified document to Purchaser 1 and specifically representing that the document contained the "correct sheet for the revenue breakout" for Giga; and emailing to Bernardi to forward to Offeree 2 false information about Giga's cash balance.

69.     While engaging in the conduct described above, Bernardi and Cardak acted knowingly, recklessly, or negligently.

70.     By engaging in the conduct described above, Bernardi and Cardak violated, and unless restrained and enjoined will again violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

(Against Bernardi and Cardak for Violations of Section 10(b) of
the Exchange Act and Rule 10b-5 Thereunder)

71.     Paragraphs 1 through 23, 35 through 57, and 63 through 65 are realleged and incorporated by reference as if fully set forth herein.

72.     By reason of the conduct described above, Bernardi and Cardak, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact

17

or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

73.     As alleged above, Bernardi's fraudulent violations included emailing falsified documents to Purchasers 1, 2, and 3, and coordinating with Cardak concerning the specific false information to include in those documents. As alleged above, Cardak's fraudulent violations included: providing falsified documents for Bernardi to email to Purchasers 1, 2, and 3; coordinating with Bernardi concerning the specific false information to include in those documents; and emailing a falsified document to Purchaser 1 and specifically representing that the document contained the "correct sheet for the revenue breakout" for Giga.

74.     While engaging in the conduct described above, Bernardi and Cardak acted knowingly or recklessly.

75.     By engaging in the conduct described above, Bernardi and Cardak violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

(Against Chandra for Aiding and Abetting Bernardi and Cardak's
Violations of Section 17(a) of the Securities Act)

76.     Paragraphs 1 through 13 and 42 through 57, and 63 through 65 are realleged and incorporated by reference as if fully set forth herein.

77.     Bernardi and Cardak violated Section 17(a) of the Securities Act [15 U.S.C. §§ 77q] by reason of their conduct described above in Claim 1 relating to Purchaser 3.

78.     Chandra knowingly or recklessly provided substantial assistance that aided and abetted Bernardi and Cardak's violations by impersonating a Giga customer on a due diligence call with Purchaser 3.

79.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Chandra is liable for those violations.

### FOURTH CLAIM FOR RELIEF

(Against Chandra for Aiding and Abetting Bernardi and Cardak's
Violations of Section 10(b) of the Exchange Act)

80.     Paragraphs 1 through 13 and 42 through 57, and 63 through 65 are realleged and incorporated by reference as if fully set forth herein.

81.     Bernardi and Cardak violated Section 10(b) of the Securities Act [15 U.S.C. §§ 77q] by reason of their conduct described above in Claim 1 relating to Purchaser 3.

82.     Chandra knowingly or recklessly provided substantial assistance that aided and abetted Bernardi and Cardak's violations by impersonating a Giga customer on a due diligence call with Purchaser 3.

83.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Chandra is liable for those violations.

### CLAIM AGAINST RELIEF DEFENDANTS

**84.**     Paragraphs 1 through 23 are realleged and incorporated by reference as if fully set forth herein.

85.     Relief Defendants Daniel Bernardi, Diane Olson, and Jenifer Bernardi each received, directly or indirectly, funds and/or other benefits that are the proceeds of Defendants' unlawful activities alleged in this Complaint and to which the Relief Defendants have no legitimate claim.

## PRAYER FOR RELIEF

86.     WHEREFORE, the SEC respectfully requests that the Court enter a Final

Judgment:

### I.

87.     Issue findings of fact and conclusions of law that Defendants Bernardi, Cardak, and

Chandra committed the alleged violations.

### II.

88.     Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil

Procedure, permanently enjoining Defendants Bernardi, Cardak, and Chandra and their agents,

servants, employees, and attorneys, and those persons in active concert or participation with any

of them, who receive actual notice of the judgment by personal service or otherwise, from violating

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### III.

89.     Order Defendants Bernardi, Cardak, and Chandra and all Relief Defendants to

disgorge all funds received from Defendants' illegal conduct, together with prejudgment interest

thereon, under Section 21(d)(5) and Section 21(d)(7) of the Exchange Act.

### IV.

90.     Order Defendants Bernardi, Cardak, and Chandra to pay civil penalties under

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)].

**V.**

91.     Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional relief

within the jurisdiction of this Court.

**VI.**

92.     Grant such other and further relief as this Court may determine to be just and

necessary.

Dated: October 20, 2021

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

S/ Melissa J. Armstrong
Melissa J. Armstrong*

*Application for admission *pro hac vice*
pending

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: (2020) 551-4724
armstrongme@sec.gov